**UNITED STATES DISTRICT COURT**
**IN THE SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| v. | § | Case No. 2:12-cr-755 |
| | § | |
| **ASHLEY EVELYN DIAZ** | § | |

**ORDER GRANTING DEFENDANT'S**
**MOTION TO SUPPRESS**

Defendant is charged with possession of cocaine with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B). (D.E. 9). Defendant filed a Motion to Suppress Drug Evidence. (D.E. 13). At a hearing on November 1, 2012, this Court took evidence and heard argument. The Court GRANTS Defendant's Motion to Suppress Drug Evidence (D.E. 13).

**I.     FINDINGS OF FACTS**

On September 7, 2012, United States Border Patrol Agents Cesar Cavazos, Abraham Puente, and Marie Ramirez conducted an immigration inspection of a Greyhound passenger bus at the permanent Border Patrol checkpoint located on United States Highway 281, south of Falfurrias, Texas.[1] Agents Cavazos and Puente boarded the bus while Agent Ramirez remained outside the bus. Immediately after boarding the bus, Agent Cavazos made an announcement to the passengers, in English and Spanish, asking them to have their identification ready for inspection. Agent Puente began his inspection at the back of the bus, working his way forward. Agent Cavazos began his inspection at the front of the bus, working his way towards the back of the bus. The bus was full, holding approximately thirty passengers.

---

[1] Having been the focal point of decades of testimony and opinions, the Court is familiar with this checkpoint's location, purpose, and activities.

Defendant was seated on the aisle in the middle of the bus. Another female passenger was next to her. As Agent Cavazos approached Defendant, he first spoke with the female passenger next to Defendant. Agent Cavazos determined that Defendant and the other female passenger were not traveling together. Agent Cavazos then asked Defendant if she was a citizen of the United States. Defendant answered in the affirmative. Defendant produced her identification from her purse. Defendant told Agent Cavazos that she was traveling to St. Louis, Missouri. Agent Cavazos satisfied himself that Defendant was lawfully present in the United States.

During this brief questioning, Agent Cavazos noticed a beige article of clothing underneath Defendant's loose-fitting blouse. It appeared to Agent Cavazos to be an undergarment made of spandex. The only portion of the undergarment that was visible to Agent Cavazos was a strip of cloth showing from under Defendant's blouse on her right shoulder. The undergarment did not show on Defendant's left shoulder. The back of Defendant's blouse was not visible to Agent Cavazos at this time.

This beige article of clothing raised Agent Cavazos's suspicion that Defendant was a "body carrier." At the beginning of each shift, Border Patrol agents are given briefing in the form of a "muster module," which alerts agents to ongoing trends in smuggling. The muster module given to Agent Cavazos the day before cited females in their 20's and 30's, who dress provocatively, travel alone or in pairs, and travel from McAllen to Dallas, Texas, as potential body carriers. The alert stated it was unknown whether these females would be heavy-set, though two female body carriers recently arrested were heavy-set. A muster module distributed the week before cited single males traveling in the evening or at midnight from McAllen, Texas to Tennessee as possible drug smugglers.

At the time of Agent Cavazos' encounter with Defendant, he remembered single, young, heavy-set females, traveling north alone were likely body carriers. Defendant was traveling alone, young, heavy-set, and heading north. These factors, in combination with the spandex piece of clothing, raised Agent Cavazos' suspicion. There was nothing else unusual or suspicious about Defendant's behavior or clothing at the time of questioning. Defendant did not appear to be nervous. Agent Cavazos completed questioning Defendant and conducted immigration inspections of two or three more individuals.

Agents Cavazos and Puente completed the immigration inspection and exited the bus together. Agent Cavazos located Agent Ramirez, a female officer who remained outside the bus, to ask her to perform a body search of Defendant. Agent Cavazos stepped back onto the front of the bus and announced, "ma'am can you come over here?" Defendant responded immediately: "who, me?" Defendant exited, following Agent Cavazos' instructions. Agent Cavazos then asked permission to conduct a body search.[2] Contraband was found on Defendant's person, hidden underneath her clothes on her back.

At the hearing on the motion to suppress, testimony and exhibits demonstrated that the beige piece of clothing that Defendant was wearing was not in fact a "body suit." What Agent Cavazos saw was actually one of two articles of clothing, each with brassiere-like straps attached to material covering the torso area. According to testimony, these two camisoles, one with an attached brief and built-in brassiere, are commonly used by women as body shapers. Evidence also showed that these common articles of clothes were made by Maidenform, a popular manufacturer of women's

---

[2]The issue of consent to search is not before the Court. During the motion hearing, Agent Cavazos did not remember the exact words used when he asked for consent to search Defendant. The Court notes the critical importance of words used in determining whether consent is voluntarily given.

underwear. These styles of undergarment can be purchased at major retail stores, such as JCPenny and Walmart, and are advertised online.

## II.   ANALYSIS

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures . . . ." U.S. Const. amend IV; *see also United States v. Portillo-Aguirre*, 311 F.3d 647, 652 (5th Cir. 2002). "'A search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing.'" *Portillo-Aguirre*, 311 F.3d at 652 (quoting *City of Indianapolis v. Edmond*, 121 S.Ct. 447 (2000)). "When law enforcement officers stop a vehicle at a highway checkpoint, a seizure within the meaning of the Fourth Amendment has occurred." *Id*. At permanent immigration checkpoints, government agents may stop travelers on a commercial bus for questioning about immigration status without individualized suspicion. *See United States v. Ventura*, 447 F.3d 375, 378, 380 (5th Cir. 2006). The scope of such a stop must be limited to determining the citizenship status of the traveler. *Id*. at 378. This may include a few brief questions and a request for identification. *Id*. An agent performing an immigration stop may only "investigate non-immigration matters beyond the permissible length of the immigration stop if the initial lawful stop creates a reasonable suspicion warranting further investigation." *Id*.

"Once an agent has completed his immigration inquiry at an immigration checkpoint, he must end his seizure of the bus unless he has reasonable suspicion of criminal wrongdoing." *United States v. Ellis*, 330 F.3d 677, 680 (5th Cir. 2003). If the immigration check is completed and reasonable suspicion has not developed during that check, further seizure may be in violation of the Fourth Amendment. *Id*. at 680-81; *see also United States v. Chacon*, 330 F.3d 323, 327-28 (5th Cir. 2003); *Portillo-Aguirre*, 311 F.3d at 655-56.

The initial seizure of Defendant by Border Patrol agents was lawful. The bus on which Defendant was traveling was stopped at a fixed checkpoint for a permissible, suspicionless immigration inspection. Border Patrol Agents Cavazos and Puente boarded the bus to check identification documents and briefly question passengers about their immigration statuses. Agent Cavazos questioned Defendant and satisfied himself that she was lawfully in the United States before continuing immigration inspections of two or three more passengers. Agents Cavazos and Puente then exited the bus. At this point, the immigration inspection of the bus was complete and further justification would be necessary to continue its detention.

Detention of Defendant beyond completion of the immigration inspection was an unlawful seizure because the agents did not have reasonable suspicion of criminal wrongdoing. In support of reasonable suspicion to detain Defendant, Agent Cavazos articulated that Defendant was a young, heavy-set woman traveling alone, that Defendant was traveling north to St. Louis, Missouri, that Defendant was wearing an undergarment, which appeared to be made of spandex, and that information coincided with a muster module.

"'Reasonable suspicion exists when the detaining officer can point to specific and articulable facts that, when taken together with rational inferences from those facts, reasonably warrant the . . . seizure.'" *United States v. Pack*, 612 F.3d 341, 352 (5th Cir. 2010) (quoting *United States v. Estrada*, 459 F.3d 627, 631 (5th Cir. 2006)). In making this determination, the court "'must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing.'" *Id*. at 352 (quoting *United States v. Arvizu*, 122 S.Ct. 744, 750 (2002)). Government agents are entitled to draw reasonable inferences from the facts of each case in light of that agent's experience. *Id*. at 351. The reasonable

suspicion standard "'falls considerably short of satisfying a preponderance of the evidence standard.'" *Id*. at 352 (quoting *Arvizu*, 122 S.Ct. at 751).

Agent Cavazos relied heavily on Defendant's undergarment as an indicator that Defendant was a body carrier. Agent Cavazos, however, testified that only a small and commonly exposed portion of this undergarment was visible at the time of the immigration inspection. In fact, he was only able to see a strip of a beige article of clothing on Defendant's left shoulder that he believed to be made of spandex. Based on this evidence, the undergarment that Agent Cavazos saw peeking out from under Defendant's blouse could have been any type of women's undergarment, ranging from a brassiere to a full body suit.[3] The commonality of such articles of clothing does not lend itself to creating individualized suspicion of wrongdoing merely by its use. And, though drugs may be stashed inside women's underwear, if the mere use of underwear was used to justify search or seizure of an individual, agents may have free rein over half the population passing through a checkpoint. *See Portillo-Aguirre*, 311 F.3d at 657 ("In short, neither the bag nor its location suggested that criminal activity was afoot. If such common circumstances qualified as reasonable suspicion, then most interstate travelers would be subject to prolonged detention, for virtually any item of luggage, from a handbag to a suitcase, is capable of housing illegal narcotics."). This undergarment, even when viewed with Defendant's northward travel as a single, heavy-set female, does not give rise to reasonable suspicion. Defendant was not nervous and Agent Cavazos did not articulate any other suspicious facts that may be used to build sufficient justification.

The government argues the muster modules received by Agent Cavazos add to the accumulation of reasonable suspicion that Defendant was a body carrier. The government's printed

---

[3] The Court has not heard before the term "body suit." No evidence was presented to the Court describing a "body suit." Neither does the Court have personal knowledge on the subject.

words on a government form do not immunize a seizure from the requirements of an objective calculation of reasonable suspicion to detain Defendant. The general characteristics listed in these briefings likely resembled many people traveling by bus, including minimally matching characteristics of the Defendant. *See Reid v. Georgia*, 100 S.Ct. 2752, 2754 (1980) (The list of observed circumstances presented did not create reasonable suspicion, as they "describe a very large category of presumably innocent travelers who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure"). Though this information is properly used by agents to alert themselves to suspicious circumstances, it cannot itself justify Fourth Amendment action. *See United States v. Hanson*, 801 F.2d 757, 762 (5th Cir. 1986) ("[A] match between the so-called profile and characteristics exhibited by a defendant does not, in and of itself, create a reasonable suspicion sufficient to justify an investigatory stop. We reaffirm the importance of that conclusion today. Mere mechanical matching of characteristics thought to be common to all drug couriers can never meet the rigorous requirements of the fourth amendment. To be reasonable, an officer's suspicion must be specific and, to some extent, individualized to the particular characteristics exhibited by a particular person.").

The Court finds that the common circumstances observed by Agent Cavazos, which lead to his belief that Defendant was carrying drugs amounted only to a hunch not an objective inference in light of the facts of the case.

### III. CONCLUSION

After their immigration inspection was complete, Border Patrol agents at the Falfurrias checkpoint could no longer detain Defendant because they had no reasonable suspicion of criminal

wrongdoing and the intrusion was significant. When Agent Cavazos ordered Defendant to leave the bus, which she did, Defendant's Fourth Amendment rights against unreasonable seizure were violated. The evidence obtained as a result of the subsequent search of Defendant's person must therefore be suppressed. *See Wong Sun v. United States*, 83 S.Ct. 407 (1963). Accordingly, the Court GRANTS Defendant's Motion to Suppress Drug Evidence (D.E. 13).

ORDERED this 7th day of November, 2012.

_____
HAYDEN HEAD
SENIOR UNITED STATES DISTRICT JUDGE